FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

03 MAR 25 AM 10: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHARHONDA SHERMAN,
CASSANDRA NEALY, and
RHONDA WHEELER,

     PLAINTIFFS,

v.                         CASE NO. CV-02-J-1611-NE

THE HEALTH CARE AUTHORITY
OF THE CITY OF HUNTSVILLE
d/b/a HUNTSVILLE HOSPITAL,

**ENTERED**

MAR 2 5 2003

     DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 57), evidence in support of said motion and a memorandum of law. The plaintiff submitted evidence and a brief in opposition to said motion (doc. 64). The defendant thereafter submitted a reply.

Plaintiffs commenced this action by filing a complaint alleging defendant violated their rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII") by allowing their supervisor to sexually harass each of them. The plaintiffs also bring various state law claims. Upon consideration of the pleadings, memoranda and evidentiary submissions, the court concludes that the motion for summary judgment is due to be granted as to the plaintiffs' claim under

Title VII as no genuine issues of material fact remain and the defendant is entitled to judgment in their favor as a matter of law. The court declines to exercise supplemental jurisdiction over the plaintiffs' remaining claims.

## FACTUAL BACKGROUND

In the light most favorable to the plaintiffs, the court finds the facts of this case to be as follows:

The plaintiffs were all hired as Environmental Service Aides in the Environmental Services Department for the defendant. Rosler affidavit,[1] ¶¶ 3, 5; Nealy depo. at 9; Sherman depo. at 41. Each of the plaintiffs claim to have had sex or something short of sex with Sullivan Thomas ("Thomas"), their supervisor, which Thomas admits. Sherman depo. at 128-129; Thomas depo. at 12; 27-28; Wheeler depo. at 17.

Plaintiff Nealy began working for the defendant on October 2, 2000. Nealy depo. at 9; plaintiff exhibit 1. Thomas was her supervisor, as was D'Juan Pope. Nealy depo. at 10. Elvest Watkins was over Thomas.[2] *Id.* at 11. David Crump

---

[1]Andrea Rosler is the Vice President of the Human Resources Department for the defendant. Rosler depo. at 5.

[2]Watkins is Operations Manager of the Environmental Services Dept. Watkins affidavit, ¶ 1.

oversees all housekeeping activities and staff, including all three plaintiffs.[3]  Crump

affidavit, ¶ 2.  Pope was over plaintiff Nealy but under Thomas, as was Teresa Burton.

Nealy depo. at 11.  Plaintiff Sherman began working for defendant on January 20,

2001.  Plaintiff exhibit 1.  Plaintiff Wheeler began her job with defendant in June,

2000.  *Id.*

Plaintiff Sherman alleges that after she had sex with Thomas in March, 2001,

he never did or said anything sexual, and she did not report it to the hospital until

November, 2001, when she was told she had to show up for work as scheduled.[4]

Poole affidavit, ¶ 13, 15; Watkins affidavit, ¶¶ 7-9.  When asked about Sherman's

complaint, plaintiff Nealy did not mention that Thomas harassed her too, and in fact,

denied any such harassment.  Poole affidavit. at ¶ 11; Nealy depo. at 45-46.  Nealy

and Wheeler never complained about Thomas to defendant.  Rosler aff., ¶ 10; Rosler

depo. at 7-9, 70-71.

Each plaintiff claims *quid pro quo* harassment:  Sherman says she had to sleep

with Thomas to be off for her Sabbath as a Seventh Day Adventist.  Her records show

she was never scheduled to work from sundown Friday to sundown Saturday, even

---

[3]David Crump is the Director of Environmental Services for defendant.  Crump affidavit,
¶ 1.

[4]Sherman received a progressive disciplinary notice in November, 2001, signed by
"Brian and Cynthia" and Joyce Taylor.  Sherman depo. at 174.  She agreed that the notice was
based on the points she had accumulated.  *Id.* at 176.

3

before she had sex with Thomas.  Poole affidavit, ¶ 6; Rosler affidavit, ¶ 21; Watkins affidavit, ¶¶ 3-4 and Exhibit A thereto (Sherman's time records); Rosler depo. at 62-66.  Additionally, Thomas did not do the scheduling.  Crump affidavit, ¶ 8; Thomas depo. at 42-43.  Watkins did Sherman's scheduling.  Poole affidavit, ¶ 15; Watkins affidavit, ¶¶  3, 6; Thomas depo. at 92-94, 97.  Nealy says she finally convinced Thomas in March, 2001 that she did not want to be his "girlfriend," and after that he would not give her time off in May or September, 2001 and belittled her about being young.  Nealy depo. at 30-32, 36; 59-60. Watkins got no request for time off from Nealy for those dates.  Watkins affidavit, ¶ 15.  Nealy also asserts she did not get a raise because of Thomas, but she got the full amount of the raise given in August, 2001, as well as a good performance evaluation.  Plaintiff exhibit 3.  Wheeler says Thomas told her if she slept with him he would make her a supervisor.  Wheeler depo. at 48-50.  Thomas did not have authority to promote anyone to supervisor.  Crump affidavit, 14; Rosler affidavit, ¶ 12; Watkins affidavit, ¶ 12.

The facts the parties dispute are not material facts.  For example, they dispute whether plaintiff Sherman is a "sheltered country girl" (plaintiff's brief at 1) or no stranger to sex (defendant's reply at 2).  This does not matter for summary judgment purposes.  Similarly, whether Sherman is a devout Seventh Day Adventist or not does not matter.  Sherman also alleges Thomas put her on a performance improvement plan

4

in July, 2001 and that she did not get a raise in August, 2001.  Everyone in the department got a one dollar raise in August, 2001.  Crump affidavit, ¶ 11 and exhibit B to affidavit; Sherman depo. at 43.  Thomas had nothing to do with Sherman being on the performance plan because he was not her supervisor then.  Thomas depo. at 185-186. During the summer, when the performance plan was implemented, Sherman worked first shift full time under Janice Johnson.  Crump affidavit, ¶ 13.  *See also* Poole affidavit, ¶ 17; Watkins affidavit, ¶ 5; Sherman depo. at 171, 173.  Sherman also alleges Thomas gave her unwarranted points for absences and being late, but he did not assign points, Joyce Taylor did.  Poole affidavit at ¶ 13; Rosler affidavit at ¶ 15; Thomas depo. at 167-168; 188-191.  *See also* plaintiff exhibit 9.

Each of the plaintiffs acknowledges that she signed for and received the defendant's sexual harassment policy. Sherman depo. at 27-32, Nealy depo. at 13-14, Wheeler depo. at 41-42.  *See also* Poole affidavit, ¶ 7.  The policy was posted on employee bulletin boards throughout the defendant hospital and on the hospital's website. Crump affidavit, ¶ 3; Poole affidavit, ¶ 7-8; Rosler affidavit, ¶ 9. The policy is in the employee handbook.  Crump affidavit, ¶ 3; Rosler depo. at 37-38, 55-56. Defendant trained Thomas to prevent sexual harassment.  Crump affidavit at ¶ 4; Poole affidavit, ¶ 8.  He was trained on the defendant's "no harassment" policy. Crump affidavit, ¶ 4; Rosler affidavit, ¶¶ 8, 11; Rosler depo. at 78; Thomas depo. at

31-33. Crump had no prior knowledge of Thomas' harassment activities. Crump affidavit, ¶¶ 6-7. Brian Horton, third shift supervisor, had no knowledge of the activities. Horton affidavit, ¶ 3. No other supervisor had any knowledge of the alleged harassment. Poole affidavit, ¶ 10; D'Juan Pope affidavit, ¶ 4. In fact, the hospital had no complaints against Thomas. Rosler affidavit, ¶ 6. Wheeler knows of no one who knew Thomas was harassing her. Wheeler depo. at 53.

The policy states harassment is prohibited, it defines what sexual harassment is, states to whom to report it, and promises to investigate complaints. *See* policy, submitted as exhibit A to Rosler affidavit. The policy also states the defendant cannot resolve matters it does not know about, so every employee is accountable for the goal of a harassment free workplace. Exhibit A to Rosler affidavit; Rosler depo. at 60. The policy also states retaliation for reporting of harassment will not be tolerated. Exhibit A to Rosler affidavit; Rosler depo. at 57. The defendant had previously fired another supervisor in the Environmental Services Department for sexual harassment and Thomas knew about it. Poole affidavit, ¶¶ 9, 12.

Sherman states she knew Thomas' advances were a violation of the sexual harassment policy. Sherman depo. at 34. She never told Crump about it, even though he had hired her. *Id.* at 35-36. She did not complain because she "needed her job. And Sullivan, he let me know that he was in charge of my scheduling and pretty much

my job." *Id.* at 37.   She alleges Thomas told her he would fire her if she told anyone,

but she never put this in any of the affidavits or statements she made before her

deposition.   *Id.* at 38-40.   She produced a diary, but does not remember why she

started keeping it or when she wrote things down in it.   *Id.* at 49-52.   She alleges that

in March, 2001, Thomas told her he had a crush on her and started touching her and

threatening her.   *Id.* at 114-115.   He kissed her against her will and made her promise

not to tell.   *Id.* at 119, 124, 217-218.   He told her he was the one who could give her

points or the hours she wanted.   *Id.* at 117.   In her diary, Sherman stated that Thomas

told her not to tell because **he** could lose **his** job, but at deposition she stated she wrote

this down wrong and it was supposed to say **she** could lose **her** job.   *Id.* at 124-125.

After the unwanted kissing and touching occurred, Sherman went to Thomas' house,

even though she did not want to, to "talk about work schedule."   *Id.* at 128.   She

alleges Thomas told her if she did not come to his house, she would "suffer the

consequences."   *Id.* at 129.   Her diary does not mention such threats.   *Id.* at 132-133.

Sherman asserts she met Thomas at the Pizza Hut parking lot at 10:30 p.m. and

followed him to his house to talk about her schedule.   Sherman depo. at 144-145, 263-

264. Sherman stated that she went to his house because "if that's what I had to do to

keep my job, that's what I had to do."   *Id.* at 147.   Sherman claims Thomas told her

he would give her Fridays and Saturdays off, and then coerced her into his bedroom.

7

*Id.* at 150-151, 268-269, 280-281, 285. *But see* Thomas depo. at 72-78. He kissed her, then told her to take her pants off and she may or may not have complied. Sherman depo. at 152, 284, 313-314. She claims she had sex with him to be off for her Sabbath. *Id.* at 152, 157. However, she admits she was already off for her Sabbath. *Id.* at 256, 308-309. She also admits that he never said if she did not have sex with him she could not be off on Fridays and Saturdays or that she would lose her job. *Id.* at 312. She claims she was forced to have sex with Thomas. *Id.* at 186. She describes it as rape. *Id.* at 287. *But see* Thomas depo. at 80-85. This occurred on March 24, 2001. Sherman depo. at 303; defendant exhibit 15 at deposition exhibit 9. Sherman then testifies that after the night she slept with Thomas, she did not have much contact with him. Sherman depo. at 159, 165-166.

After Sherman filed her EEOC charge, she started going to counselors for depression and saw several one or two times. Sherman depo. at 67-74; 318. She sought no treatment before she sued. *Id.* at 192. Sherman claims as a result of having sex with Thomas, she did not get the raise everyone else got and got a bad evaluation. *Id.* at 160, 163-164. Defendant's records show that Sherman received this raise. Sherman also claims Thomas did not give her flexible scheduling like she was promised and "[t]hey had started trying to give me points if I did not tell them exactly

what time I would be in." *Id.* at 161-162.  This is related to having sex with Thomas

because "it happened after I slept with him." *Id.* at 165.

Nealy did not report the alleged sexual harassment because she "wouldn't have

wanted to interfere with my job or possibly lose my position." Nealy depo. at 15, 21.

She "didn't want any trouble." *Id.* at 22.  In the fall of 2000, Thomas invited her to

his house to eat pizza. *Id.* at 23, 73. Thomas tried to kiss her but she pushed him away

and left. *Id.* at 24.  In December, 2000, she went back to his house and fooled around

with him, but did not actually have sex. *Id.* at 25, 28; Thomas depo. at 120-122.  She

went back to his house because she was "curious." Nealy depo. at 29, 74. He seemed

"like a nice, respectable gentleman." *Id.* at 43.  December, 2000 was the last time he

touched her and he did not ask for sex after that. *Id.* at 29-30, 88.  He quit asking her

to be his girlfriend in March, 2001. *Id.* at 36, 84-85.  After this, he did not give her

time off she wanted and belittled her six to ten times by saying she was young and a

"little girl." *Id.* at 30-31, 109, 120.  She alleges that he told her she could have

permission to be off before she told him she would not sleep with him. *Id.* at 80-81.

Nealy also alleges he gave her a write up in August, 2001, and in December, 2001, for

the number of points she accumulated because she did not sleep with him in

December, 2000.[5] *Id.* at 96-97, 128.  However, Thomas did not give the points. *Id.*

---

[5]No evidence of such a disciplinary warning has been submitted as evidence.

depo. at 131-133.   Thomas was responsible for the raise she got based on her evaluation after she told him to leave her alone. *Id.* at 102-104, 135. Nothing Thomas did after March, 2001, affected her wages, hours, benefits or employment. *Id.* at 141.

Wheeler states Thomas began talking crudely to her when she started working for defendant in June, 2000. Wheeler depo. at 18-20. He forced a kiss on her in July, 2000. *Id.* at 21. She went to Pizza Hut with him because Thomas said he would make her a supervisor. *Id.* at 22-23. She had voluntary sex with him so she could be a supervisor and because she "really did find him attractive" and "a gentleman." *Id.* at 24-25, 33. After this, in August, 2000, he began harassing her at work. *Id.* at 34-36. When she was rehired in October, 2001, Thomas told her he was glad to see her back and that "Big Daddy really missed you a lot." *Id.* at 37, 47-48. She never reported this because "I felt if I said anything my job would have been in jeopardy." *Id.* at 43. She admits she never read the employee handbook but states this was because "Mr. Thomas was my supervisor ... And I really didn't want to lose my job because I had a responsibility to take care of at home, my children and my grandchildren." *Id.* at 43. Thomas says he and Wheeler dated around June, 2000. Thomas depo. at 143-149. He broke it off with her because she was also dating a married man and he did not want to get shot. *Id.* at 144.

10

Connie Poole, Human Resources Specialist in defendant's Human Resources department, states Sherman complained on November 16, 2001 that she had sex with Thomas in March, 2001after he kissed her at work several times.  Poole affidavit, ¶ 2; Sherman depo. at 83-85, 87, 96-97.  She told Poole that Thomas criticized her work.  Poole affidavit, ¶ 3.  She said she did not want Thomas to lose his job. Sherman depo. at 86.  Sherman states she did not go to Human Resources sooner because Thomas was "still doing the things that he was doing."  *Id.* at 91. Sherman alleges Thomas would try to kiss her, touch her breasts and put his hands on her buttocks, but does not know when this was.  *Id.* at 95.  No one ever saw this.  *Id.* at 96. She does not remember when he stopped inviting himself to her apartment.  *Id.* at 92. This happened two times after she talked to Poole, but she does not remember when this was.  *Id.* at 93-94.

Upon learning of the allegations, the defendant investigated.  Rosler depo. at 73-74.  Sherman was transferred to another location while the defendant investigated. Poole affidavit ¶ 5.  Sherman did not want to work in the other location because she heard they "cleaned differently" so she took three weeks paid leave instead.  Poole affidavit, ¶ 5; Sherman depo. at 104-105.  She complains there was no investigation done, but testifies that when asked questions, she told them she was not answering any questions without her lawyer.  Poole affidavit, ¶ 19; Sherman depo. at 101-102.

All three of the plaintiffs are still employed by defendant.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.R.

12

Civ.Pro. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970).  The substantive law will identify which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11ᵗʰ Cir.1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249.  The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require

13

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

## LEGAL ANALYSIS

Assuming each of their allegations of sexual harassment is true, the plaintiffs cannot prevail on their claims.

Sherman filed the first EEOC charge on November 29, 2001. Each of the plaintiffs asserts the harassment was in the nature of continuing violations. Wheeler asserts after she was rehired (she was fired in June, 2001 for threatening to "bash in" another employee's head in October, 2001), Thomas continued to harass her. Wheeler depo. at 14-16, 37; *see also* Rosler affidavit, ¶ 13. Wheeler filed an EEOC charge on December 11, 2001. Nealy filed her charge on December 14, 2001. Although each of the plaintiffs claims the harassment was "continuing," no evidence supports this for plaintiff Sherman and Nealy. The court also doubts Wheeler has established a continuing violation of Title VII. These claims are time barred. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2074 (2002); *City of Hialeah v. Rojas*, 311 F.3d 1096 (11th Cir. 2002). However, because the court finds that, regardless of whether the claims are time barred, the plaintiffs cannot prevail, the court assumes, for purposes of this opinion, that the plaintiffs did have

14

allegations of harassment within the statutorily mandated 180 day period.  *See* 42

U.S.C. § 2000e-5(e)(1).

The court finds no evidence of any tangible, adverse employment action against

any of the plaintiffs. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239-41 (11th

Cir. 2001).   Similarly, even if the claims were not time barred, and even if the

plaintiffs could make out a prima facie case of harassment, the *Faragher/Ellerth* good

faith defense applies.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct.

2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742,

118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Sexual harassment has two forms: harassment that does not result in tangible

employment action (hostile work environment harassment) and harassment that does

result in tangible employment action (quid pro quo harassment).  *Johnson v. Booker

T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).   The

plaintiffs seem to allege both types of harassment.   They each claim Thomas

demanded sex in exchange for something, and also allege that after they each had sex

or something close to it with him, the work environment became hostile due to his

either asking for more sex, or taking actions against them.

To establish a prima facie claim for sexual harassment, each of the plaintiffs

must show: (1) that she belongs to a protected group; (2) that she was subject to

unwelcome sexual harassment, such as sexual advances or requests for sexual favors; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) a basis for holding the employer liable.[6] *Pipkins v. City of Temple Terrace, Florida,* 267 F.3d 1197, 1200 (11th Cir. 2001); *Johnson,* 234 F.3d at 507-508 and n. 7; citing *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1361 (11th Cir.1994).  In the light most favorable to the plaintiffs, the first three elements of the prima facie case are met. However, assuming the plaintiffs could each show that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of employment, the court can find no basis to hold the employer liable.

The defendant may be held strictly liable if (1) the harassment was by the plaintiffs' supervisor and (2) the supervisor took a tangible employment action against them. *Johnson,* 234 F.3d at 509.  However, the converse is also true:  The defendant may avoid liability if (1) the harasser was not the plaintiffs' supervisor; or (2) the harasser took no tangible employment action against them. *Id.* at 510.  Clearly, Thomas was each of the plaintiff's supervisor.  However, the court finds no tangible

---

[6]The Eleventh Circuit has stated it can see no important distinction between a prima facie case under *quid pro quo* as opposed to hostile environment claims and thus will apply the *Mendoza* factors irrespective of the terms *quid pro quo* and hostile environment. *Johnson,* 234 F.3d at 507-508 n. 7; citing *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244-45 (11th Cir.1999) (en banc), *cert. denied,* – U.S. – , 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000).  This court has done likewise, although plaintiffs allege both a hostile environment and *quid pro quo* harassment.

employment action was taken against any of the plaintiffs.  A tangible employment

action is "a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits. *Ellerth*, 524 U.S. at 761; 118 S.Ct. at 2268.

*See also Davis*, 245 F.3d at 1238-1239 (stating that not all conduct by an employer

negatively affecting an employee constitutes an adverse employment actions and

requiring a "threshold level of substantiality").  Sherman was transferred to a different

shift in June, 2001, at her own request.  She does not complain about this transfer.

She was also transferred to a different building after she registered her complaint with

Poole, but, upon her refusal to work there, the defendant placed her on paid leave until

Thomas was forced to resign.  Sherman also asserts she did not get a raise, but the

defendant's records show that she received it.

Nealy alleges Thomas gave her a "write up" in August, 2001, and in December,

2001, for the number of points she accumulated because she did not sleep with him

a year earlier.  However, she agrees Thomas did not assign points. She received a

"write up" for being late to work.  Even if Thomas were somehow maliciously behind

the point accumulations of Nealy and Sherman, the Eleventh Circuit Court of Appeals

has stated that, when a job performance memorandum does not cause any present or

foreseeable economic injury, it does not meet the statutory threshold of "adverse

17

employment action." *Davis*, 245 F.3d at 1240.  This is so even when a performance evaluation is "negative," without any other adverse impact.  *Id.* at 1241.  Nealy agrees that  Thomas was responsible for the raise she got based on her evaluation after she told him to leave her alone and that nothing Thomas did after March, 2001, affected her wages, hours, benefits or employment.

Wheeler does not even allege an adverse employment action, other than she was not made a supervisor.  However, no evidence disputes that Thomas did not have the authority to promote anyone to supervisor and that Wheeler was not considered to be eligible for promotion by Thomas' supervisors.  As such, the court finds no tangible employment action taken against any of the plaintiffs.

Because the court can find no tangible employment action, the two-part affirmative defense under *Ellerth* and *Faragher* applies.  Under the "safe harbor" of the *Ellerth/Faragher* affirmative defense, the defendant may show by a preponderance of the evidence that 1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and 2) the plaintiff's unreasonably failed to take advantage of any preventative or corrective opportunities provided by the defendant. *Ellerth,* 524 U.S. at 764-65, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2293. Generally, dissemination of an anti-harassment policy with effective complaint procedures satisfies the first prong of this defense.  *See e.g.*, *Madray v.*

*Publix Supermarkets*, 208 F.3d 1290, 1298 (11ᵗʰ Cir.2000). Clearly, the procedure utilized by the defendant was effective because the defendant investigated and then dismissed the harasser within a reasonable time frame.[7]

Once an employer has "promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances.'" *Madra*y, 208 F.3d at 1300; citing *Farley v. American Cast Iron Pipe*, 115 F.3d 1548, 1554 (11ᵗʰ Cir. 1997).

None of the plaintiffs reported the alleged harassment by Thomas until late November, 2001 and Thomas involuntarily resigned, rather than be fired, on December 13, 2001. Sherman depo. at 97-98; Thomas depo. at 171; Crump affidavit, ¶ 10; Poole affidavit, ¶ 23; Rosler affidavit, ¶ 19; Rosler depo. at 105-106; Wheeler depo. at 38, 52; Nealy depo. at 46-47. Once Sherman put the defendant on notice of the harassment, it took prompt action. Of course, without this notice, the defendant could not take corrective or preventative action. *See Dee's v. Johnson Controls*, 168 F.3d 417, 422 (11ᵗʰ Cir. 1999); *Madray*, 208 F.3d at 1299.

---

[7]The court notes that the defendant's investigation was hampered by Sherman's insistence she would not answer questions without her attorney present.

19

The plaintiffs failure to use the complaint procedure provided by that policy suffices to meet the second prong of the affirmative defense. *Faragher,* 524 U.S. at 807-808, 118 S.Ct. at 2293. *See also Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1314 (11th Cir. 2001); *Madray,* 208 F.3d at 1302. In spite of every effort defendant made to educate the plaintiffs on its sexual harassment policy, the plaintiffs opted not to use that policy. Sherman waited approximately eight months before notifying defendant of the alleged harassment. Wheeler and Nealy never did that much.

The court finds the defendant exercised reasonable care to prevent sexual harassment. The defendant responded promptly to correct the alleged harassment when it received notice of the same. The plaintiffs acted unreasonably in failing to read and follow the policy, even though they each had copies of it, it was posted at their place of employment, and available on the defendant's web site. Therefore, the court concludes that the defendant is entitled to the *Faragher/Ellerth* affirmative defense to avoid vicarious liability for the alleged sexual harassment.

Plaintiff relies on *Williams v. General Motors*, 187 F.3d 553, 558 (6th Cir. 1999) and suggests the court follow this case over the "old standard" cases of *Faragher* and

*Burlington.* Plaintiff's brief at 5, 22. The court declines this invitation as the issue in *Williams* is not before this court.[8]

Each plaintiff states four separate counts of Title VII sexual harassment claims (Counts 4, 5, 6, 7, 12, 13, 14, 15, 20, 21, 22, and 23). These claims shall all be dismissed by separate order.

While this court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), the court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). These claims are for outrage (Counts 1, 9, and 17); negligent supervision (Counts 2, 10, and 18), violation of § 25-6-1(a), Ala. Code (Counts 3, 11 and 19) and invasion of privacy (Counts 8, 16 and 24). The court notes that the plaintiffs did not sue Sullivan Thomas as an individual. Because resolution of the remaining counts of the plaintiff's complaint depend on determinations of state law, those claims are best resolved by the Alabama courts. *See Baggett v. First National Bank of Gainesville,* 117 F.3d 1342, 1352-1353 (11th Cir.1997). The court notes that the plaintiff's state law claims will not be barred by the statutes of limitations in light of the tolling provisions of 28 U.S.C. § 1367(d).

---

[8]In that case, the Sixth Circuit considered whether complaints are properly considered when broken in to their component parts – for example considering foul language separate and apart from sexually harassing remarks. *Williams*, 187 F.3d at 562.

## CONCLUSION

The court having considered the foregoing, and finding that the plaintiffs have failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendants' motion for summary judgment on Counts 4, 5, 6, 7, 12, 13, 14, 15, 20, 21, 22, and 23 is hereby **GRANTED**. The claims are **DISMISSED WITH PREJUDICE**. The plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**. Each party is to bear its own costs.

**DONE** and **ORDERED** this the _____ day of March, 2003.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

22